## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**UNITED STATES OF AMERICA**              **CASE NO.  6:21-CR-00312-01**

**VERSUS**                                **JUDGE ROBERT R. SUMMERHAYS**

**KRISTAL GLOVER-WING (01)**              **MAGISTRATE JUDGE DAVID J. AYO**


### RULING

Before the Court are a Motion for Judgment of Acquittal and a Motion for New Trial, filed by Defendant Kristal Glover-Wing.[1] The Government opposes the motions.[2] For the reasons that follow, the motions are DENIED.[3]

### I.
### BACKGROUND

On December 15, 2021, a grand jury in the Western District of Louisiana returned a four count Indictment against Kristal Glover-Wing (a registered nurse) and two physicians, charging all three with Conspiracy to Commit Healthcare Fraud in violation of 18 U.S.C. § 1349 (Count 1), and three counts of Healthcare Fraud in violation of 18 U.S.C. § 1347 (Counts 2–4).[4] With regard to Glover-Wing, the indictment alleged that she owned, controlled and was President of Angel Care Hospice, Inc. ("ACH"), "a Louisiana corporation that purported to provide hospice services" within this District.[5] The indictment further alleged that from 2009 through 2017, Glover-Wing and her codefendants conspired to falsely certify patients as hospice-eligible in order to defraud Medicare.[6] Trial commenced on March 13, 2023. On April 4, 2023, Glover-Wing was convicted

---

[1] ECF Nos. 213, 214.
[2] ECF Nos. 215, 216.
[3] The Court uses the page numbers generated by CM/ECF throughout this opinion.
[4] ECF No. 1.
[5] *Id.* at 1.
[6] *Id.* at 6-9.

on all counts; her codefendants were acquitted on all counts.[7] Glover-Wing moved for judgment of acquittal at the close of the Government's case-in-chief, at the close of Defendant's case-in-chief, and after the jury returned its verdict.[8] The Court reserved ruling, and Defendant has now renewed her motion, arguing the evidence was insufficient to sustain her convictions.[9] She additionally moves for a new trial, asserting "she was deprived a fair trial as guaranteed by the Fifth Amendment's Due Process Clause."[10]

## II.
### LEGAL STANDARDS

"A motion for judgment of acquittal challenges the sufficiency of the evidence to convict."[11] "Evidence is sufficient to support a conviction so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[12] In applying this standard, the court must view all of the evidence in the light most favorable to the Government, and "with all reasonable inferences and credibility choices to be made in support of the jury's verdict."[13] Further, the court must "bear in mind that the jury is free to choose among reasonable constructions of the evidence, even when certain evidence conflicts or suggests innocence."[14]

A motion for new trial is warranted "if the interest of justice so requires."[15] Unlike a motion for judgment of acquittal, the trial court "may re-weigh evidence and assess witness credibility in considering a motion for new trial."[16] Requests for a new trial generally take two forms—a lack

---

[7] ECF No. 171; *see also* ECF Nos. 173, 175.
[8] ECF No. 203 at 45; ECF No. 204 at 41; ECF No. 205 at 66.
[9] ECF No. 205 at 67; ECF No. 213.
[10] ECF No. 214 at 2.
[11] *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) (quoting *U.S. v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)).
[12] *United States v. Gas Pipe, Inc.*, 997 F.3d 231, 240 (5th Cir. 2021) (internal quotation marks omitted).
[13] *Id.* (quoting *United States v. Bolton*, 908 F.3d 75, 89 (5th Cir. 2018)).
[14] *U.S. v. Shoemaker*, 746 F.3d 614, 619 (5th Cir. 2014) (internal quotation marks omitted).
[15] Fed. R. Crim. P. 33(a).
[16] *Shoemaker* at 619.

of evidentiary support for the verdict, or procedural defects causing a miscarriage of justice.[17] Under the first category, the defendant must show that the verdict "is so strongly against the weight of the evidence that it affects the defendant's substantial rights."[18] The latter category (upon which Glover-Wing relies) addresses error that infects the trial causing a miscarriage of justice, such as "the erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions."[19]

### III.
### ANALYSIS

**A.**     **Motion for Judgment of Acquittal**

    **1.**     **Whether a rational jury could have found Defendant had the specific intent to defraud and knowledge of the fraud.**

Defendant asserts the evidence at trial was insufficient to support her convictions, arguing no rational jury could have found she had the requisite "intent to defraud" and "knowledge of the fraud" to sustain a conviction under the applicable statutes.[20] In support, she argues that each of the twenty-four patients the Government relied upon to support its case at trial were certified as hospice appropriate by a physician. She then notes that other treating physicians testified at trial that those patients were not hospice eligible. Based upon this conflict in the testimony, Glover-Wing concludes the evidence was insufficient for a conviction:

> In sum, such a disagreement between different doctors' professional medical judgments, standing alone, is more than sufficient to give rise to a reasonable doubt as to whether Ms. Glover-Wing defrauded Medicare knowingly and with a specific intent to defraud, because she was not a medical doctor and acted only in good faith reliance on the professional judgment of the doctors.[21]

---

[17] *U.S. v. Hoffman*, 901 F.3d 523, 552 (5th Cir. 2018); *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022).
[18] *Hoffman* at 552.
[19] *Crittenden* at 296; *see also Hoffman* at 552.
[20] ECF No. 213 at 4.
[21] *Id.* at 9.

The Medicare Hospice Benefit is a Medicare funded service for the terminally ill that provides holistic end-of-life care that is palliative in nature, rather than curative.[22] To qualify for the Medicare Hospice Benefit, both the patient's primary care physician and the medical director of the hospice provider must certify in writing that the patient is "terminally ill," which is defined as having a life expectancy of "6 months or less."[23] The initial hospice certification expires after ninety days unless recertified by either the patient's primary care physician or the medical director of the hospice agency.[24]

"A person commits health care fraud by 'knowingly and willfully execut[ing] a scheme to defraud a government health care program like Medicare.'"[25] "A person is guilty of conspiring to commit health care fraud when he knowingly agrees to execute the fraud scheme with the intent to further its unlawful purpose."[26] To act "knowingly" means that "the act was done voluntarily and intentionally, not because of mistake or accident."[27] "A defendant acts with the requisite 'intent to defraud' if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to the defendant."[28]

---

[22] 42 C.F.R. § 418.3; *see also United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir. 2022); *United States v. Little*, 21-11225, 2023 WL 7294199, at *1 (5th Cir. Nov. 3, 2023).
[23] 42 U.S.C. §§ 1395f(a)(7); 1395x(dd)(3)(A); *see also* 42 C.F.R. § 418.3 ("Terminally ill means that the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course.").
[24] 42 U.S.C. § 1395f(a)(7).
[25] *Mesquias* at 280 (alteration in original) (quoting *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2022)).
[26] *Mesquias* at 280 (citing *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013)).
[27] Pattern Crim. Jury Instr. 5th Cir. 1.41 (2019).
[28] Pattern Crim. Jury Instr. 5th Cir. 2.59 (2019).

The Court finds sufficient evidence was presented at trial to show that Glover-Wing acted knowingly and with the specific intent to defraud the Medicare program. The Government presented overwhelming evidence that Glover-Wing orchestrated a scheme whereby numerous patients were certified for hospice care, despite being ineligible for such services. The following is merely a sample of the evidence offered at trial:

The Government called multiple former employees of ACH who testified that Glover-Wing instructed them to intentionally falsify patients' medical records. For example, LPN Andrea Benjamin testified that Glover-Wing instructed her that when she charted a patient's file, she had to "think outside the box," and document things that "could possibly happen with the patient, not just what we saw."[29] She additionally testified that on one occasion when she was performing a "chart check" on a cancer patient (*i.e.*, ensuring the necessary documents were in the patient's file), she brought it to Glover-Wing's attention that the patient's hospital records indicated that the patient's cancer had been removed. Glover-Wing told Ms. Benjamin that she would not discharge the patient because the cancer could return.[30] She also testified that if a patient wanted to go to the hospital, Glover-Wing would discharge them from hospice "[b]ecause they weren't supposed to be seeking [curative] treatment and she [Glover-Wing] didn't want to be responsible for the bill." After the patient was discharged from the hospital, he or she would be re-admitted to ACH.[31] Ms. Benjamin left her employment with ACH in part because "the patients that were receiving services, their diagnosis was not accurate."[32] As an example, she referenced patients admitted for "end stage kidney cancer and the kidney was removed."[33]

---

[29] ECF No. 193 at 118.
[30] *Id.* at 117-18.
[31] *Id.* at 121.
[32] *Id.* at 123.
[33] *Id.* at 123.

Sheresha Washington (RN) testified that she quit her employment with ACH because Glover-Wing asked her to falsify her chart notes. Specifically, an ACH patient was discharged from hospice in order to go to the hospital. After the patient's release from the hospital, Glover-Wing instructed Ms. Washington to go to the client's house and readmit her to hospice, but to back-date her readmission to the date of her release from the hospital.[34] RN Christabelle Cleveland testified that Glover-Wing instructed her to "chart the patient like on their worst day."[35] NP Sarah Leblanc testified that Glover-Wing instructed her that when charting and making notes in a patient's file, she was to "chart the worst stuff, not the good stuff."[36]

LPN Shiela Romero testified that Glover-Wing did not want patients to go to the hospital because "as soon as they went to the hospital, hospice services would be cut off and then she [Glover-Wing] wouldn't get paid for that day."[37] She additionally testified that Glover-Wing instructed her that when she was meeting with patients and their families, she was not to use the word "hospice," because it "deterred some people from wanting the service."[38] Sometimes when making home visits the patient was not home, because "[t]hey ran to the store on their scooter or things like that."[39] Stephanie Alfred (office manager) testified that she submitted a complaint to the Department of Health advising that patients at ACH were not appropriate for hospice.[40] She further testified there was a high employee turnover rate at ACH "[b]ecause a lot of employees felt that it was unethical for a lot of the patients to be on hospice when they shouldn't have been. And so they didn't want to jeopardize their license, so they started quitting."[41]

---

[34] *Id.* at 90-92.
[35] *Id.* at 66.
[36] *Id.* at 170.
[37] ECF No. 196 at 257.
[38] *Id.* at 251-52.
[39] *Id.* at 258-59.
[40] ECF No. 192 at 174.
[41] *Id.* at 207.

The Government also called several former Medical Directors of ACH. Dr. Bryan A. LeBean served as Medical Director of ACH from September of 2016 through June of 2017. He testified Glover-Wing asked him to refer patients from his clinic to ACH, but he declined to do so, stating it was the patient's decision as to which hospice provider they wished to use.[42] He further testified that Glover-Wing asked if she could come to his office and review his patient files, but he did not permit her to do that.[43] After he had been at ACH for a while, he discharged "quite a few" ACH patients because he felt "they were not qualifiable any longer for hospice."[44] He ended his employment with ACH because he was "no longer feeling comfortable in that particular hospice company."[45]

Dr. Wartelle Castille served as an ACH Medical Director from September through December of 2013.[46] He was offered a one-time bonus of $1,500 if there were 40 to 49 patients on ACH's census, and $2,000 if there were 50 or more patients.[47] Glover-Wing asked him to refer patients to ACH and stressed the importance of keeping the patient census up.[48] When asked why he resigned from ACH, Dr. Castille stated, "I didn't have confidence that what I was doing or the organization I was working with was ethical."[49] As an example, he testified that on one occasion, an individual came to his office with his parents (none of whom he had ever treated), asking him to certify his parents for hospice. Dr. Castille later found out the person worked for ACH.[50]

---

[42] ECF No. 202 at 26-27.
[43] *Id.* at 28.
[44] *Id.* at 28.
[45] *Id.* at 29.
[46] ECF No. 201 at 263.
[47] *Id.* at 264.
[48] *Id.* at 266.
[49] *Id.* at 271.
[50] *Id.* at 272-73.

The Government also called numerous former patients of ACH, friends and relatives of ACH patients, and treating physicians of ACH patients. Brenda Trahan was a patient of ACH from July 21, 2016, to October 3, 2016, and again from November 4, 2016 through June 20, 2017. Her admission was based on a diagnosis of COPD.[51] Ms. Trahan testified at trial that she learned of ACH when an ACH representative came to her door to solicit her as a patient.[52] The representative said ACH could provide her with free medications, loan her an oxygen unit for her COPD, help her with housecleaning, and other services.[53] The representative did not explain to her that ACH was a hospice program.[54] At that time, Ms. Trahan lived alone and drove herself. In fact, she still lived alone at the time of trial and was still driving herself.[55] Since being discharged from ACH, Ms. Trahan has had two hip replacements and a knee replacement.[56] Dr. Patrick LeLeux, Ms. Trahan's primary care physician (as well as a hospice medical director), testified that he began treating Ms. Trahan in 2015. Ms. Trahan's treatment with Dr. LeLeux ended when she was placed on hospice.[57] Dr. LeLeux testified he was surprised and concerned when he learned Ms. Trahan was on hospice, because she was not on oxygen, she was driving and active, and he had never diagnosed her with a terminal illness.[58] After her discharge from ACH, Ms. Trahan restarted her treatment with Dr. LeLeux and he still treated her at the time of trial.[59] Ms. Trahan's final discharge order from ACH reads, "Patient no longer terminally ill."[60]

---

[51] ECF No. 196 at 8, 11.
[52] ECF No. 198 at 39.
[53] *Id.* at 39-40.
[54] *Id.* at 40.
[55] *Id.*
[56] *Id.* at 44-45.
[57] ECF No. 202 at 110-12.
[58] *Id.* at 112-13.
[59] *Id.* at 114.
[60] ECF No. 196 at 11.

Edna Arsement was a hospice patient of ACH from July 29, 2016 through June 20, 2017.[61] She was told ACH would provide her with physical therapy, nursing visits, monitor her medications, etc.[62] She was never told ACH was a hospice company.[63] In 2016 or 2017, she travelled by bus alone to Florida to visit her new grandson.[64] At the time of trial, Ms. Arsement was still living alone.[65] Dr. Daniela Cardoza-Kellogg was Ms. Arsement's primary care physician at the time she enrolled in hospice. Dr. Cardoza-Kellogg testified Ms. Arsement was not terminally ill and did not have a terminal condition while enrolled as an ACH hospice patient.[66]

Weslyn Noel is the daughter of Althea Colomb. Ms. Colomb was a hospice patient of ACH from November 1, 2013 through April 23, 2014.[67] Ms. Colomb passed away on January 15, 2023 due to a complication from surgery.[68] According to Ms. Noel, Ms. Colomb was active until she died, and she attended a New Orleans Saints football game the month prior to her death.[69] In 2014, Ms. Colomb would drive back and forth between Louisiana and Texas to help her husband who was recovering from a lung transplant.[70] Ms. Colomb's primary care physician, Dr. Kemp Coreil (who is board certified in hospice and palliative care and has previously served as a hospice medical director) testified at trial that that when Ms. Colomb advised him she was on hospice, he was surprised because she had no qualifying diagnosis and her condition had not changed in the previous four or five years.[71] Due to his concerns, Dr. Coreil called ACH to inquire as to why Ms.

---

[61] ECF No. 194 at 84.
[62] ECF No. 198 at 61.
[63] *Id.*
[64] *Id.* at 65-66.
[65] *Id.* at 66.
[66] ECF No. 201 at 163-64.
[67] ECF No. 194 at 139.
[68] ECF No. 198 at 243.
[69] *Id.* at 243.
[70] *Id.* at 244-45.
[71] ECF No. 201 at 96-97.

Colomb had been placed on hospice and was told her admitting diagnosis was "peripheral vascular disease."[72] He testified Ms. Colomb was not appropriate for hospice during his treatment of her from 2008 through 2015.[73]

Cynthia Alexander was placed on hospice from February 4, 2016, through January 26, 2017, with an admitting diagnosis of "end-stage lupus."[74] Ms. Alexander testified that she was not always at home when the hospice employees made home visits, because during that period of time, her mother was dying and she would often walk to her mother's house to be with her.[75] In 2019, Ms. Alexander volunteered at a school as a foster grandparent.[76] Ms. Alexander was still driving herself at the time of trial.[77] Dr. Suman Lata, Ms. Alexander's rheumatologist from 2015 to 2018, testified that Ms. Alexander never had end-stage lupus and that her condition was treatable.[78] She saw Ms. Alexander the day before she enrolled in hospice, and at that time Ms. Alexander's condition was not terminal.[79] Dr. Lata continued providing curative treatment to Ms. Alexander through 2018 because she was unaware Ms. Alexander was on hospice.[80]

Frank Gondolpha was a patient of ACH from July of 2011 through October 2013.[81] His friend and his pastor both testified at trial that Mr. Gondolpha lives alone, takes care of himself and his dog, does his own shopping and cooking, attends church every Sunday, and mows his own grass.[82] Mr. Gondolpha was still alive at the time of trial in 2023.[83]

---

[72] *Id.* at 97-98.
[73] *Id.* at 96, 107.
[74] ECF No. 194 at 55, 57.
[75] ECF No. 200 at 154.
[76] *Id.* at 156.
[77] *Id.* at 152.
[78] ECF No. 201 at 27.
[79] ECF No. 200 at 15, 19.
[80] *Id.* at 23.
[81] ECF No. 194 at 166.
[82] ECF No. 198 at 284, 287-88.
[83] *Id.* at 287.

The Government also called expert witnesses. Laurie McMillan, an expert in Medicare's rules for hospice programs, testified that she reviewed the files of the twenty-four ACH patients that the Government relied upon at trial to prove its case and found that 100% of those claims should have been denied. She described this as "an extremely high error rate."[84] According to the Government, ten of those twenty-four patients are still alive today.[85]

This evidence, which again is only a sampling, was more than sufficient for the jury to find that Glover-Wing acted knowingly and with the specific intent to defraud Medicare. Both statutes under which Glover-Wing was convicted (health care fraud and conspiracy to commit same) "require proof of knowledge and specific intent to defraud," but "this proof may be inferred from circumstantial evidence."[86] Here, multiple witnesses testified to Glover-Wing's instructions to her employees that they were to lie about the severity of ACH patients' medical conditions in order to maintain their hospice eligibility. Multiple witnesses testified that if a patient wished to go to the hospital to receive curative treatment (which is impermissible under hospice regulations), Glover-Wing would discharge them from hospice and then re-enroll them shortly after discharge, and on at least one occasion, asked an employee to backdate that readmission in order to fraudulently receive payments from Medicare to which she clearly was not entitled. There was evidence that Glover-Wing instructed her employees not to use the word "hospice" when recruiting patients as this might deter them from enrolling with ACH. There was evidence that numerous patients were clearly not eligible for hospice because they were active, drove themselves, rode around town on

---

[84] ECF No. 194 at 18, 49-50. McMillan testified that the primary reasons that the claims should have been denied were: there was either no election statement or it was missing required elements; there was no certification of terminal illness, or the certification was missing required elements; beneficiaries were billed at a higher level of care than supported by the documentation. *Id.* at 50.

[85] ECF No. 216 at 7.

[86] *U.S. v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014); *see also U.S. v. Veasey*, 843 Fed.Appx. 555, 562 (5th Cir. 2021).

their scooters, drank beer frequently, mowed their own grass, were capable of travelling out of state alone, etc. Defendant's contention that disagreements between treating physicians and certifying physicians as to whether various patients were hospice eligible, in and of itself, demonstrates "reasonable doubt as to whether Ms. Glover-Wing defrauded Medicare knowingly and with a specific intent to defraud," is incorrect.[87] This essentially is an argument that the jury should have believed Glover-Wing's theory of the case rather than the Government's theory. But such an argument does not establish the evidence was insufficient for a conviction. The relevant question is whether, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[88] The Court finds that standard has been met.

### 2. Whether a rational jury could have found that Defendant entered into a conspiratorial agreement.

Defendant contends that "no rational jury could have found that she entered into a conspiratorial agreement with any co-conspirators, because the Government, by its own unequivocal words, declared to the defense that the scope of the conspiracy was limited to the three charged defendants," and only one of those defendants, Kristal Glover-Wing, was adjudged guilty.[89] In support, Defendant relies on a portion of the Government's closing argument, where it stated:

---

[87] ECF No. 213 at 9.
[88] *United States v. Marchetti*, 22-40617, -- F.4th --, 2024 WL 1191811, at *3 (5th Cir. Mar. 20, 2024); *U.S. v. Delgado*, 668 F.3d 219, 225 (5th Cir 2012). Defendant appears to base this argument on the "equipoise rule" (*i.e.*, when the evidence gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, a reasonable jury must entertain a reasonable doubt). *See* ECF No. 213 at 2, 9. However, that rule was abrogated by the Fifth Circuit in *U.S. v. Vargas-Ocampo*, 747 F.3d 299, 300-01 (5th Cir. 2014).
[89] ECF No. 213 at 10.

> If you believe the government has proven beyond a reasonable doubt that Kristal Glover-Wing had a healthcare fraud scheme, if you're convinced of that, and you should be based on all of the overwhelming evidence the government has presented, if you convict her, you have to convict [her co-defendants]. And here's why.
>
> Wing can't do it without the doctors. She needs the doctors to make this work. . . . They can't do it without her and she can't do it without them.[90]

From this, Defendant concludes "the 'specific indicia of prejudice' in this case compels the conclusion that there was insufficient evidence to support Ms. Glover-Wing's conspiracy conviction."[91] While Defendant acknowledges that "jury verdicts convicting a defendant but acquitting another in the same case are generally upheld," she asserts that the Supreme Court recognized an exception to that rule in *United States v. Powell*, and further asserts that exception is applicable here.[92]

*Powell* provides no support for this argument. In *Powell*, a defendant was acquitted of various narcotics felonies, but convicted of three counts of using a telephone to facilitate the same narcotics felonies. On appeal, the defendant argued her verdicts were inconsistent, because an element of the facilitation charge was that defendant committed the felonies that she allegedly facilitated. The Ninth Circuit agreed and vacated defendant's convictions. The Government petitioned for rehearing, arguing the court had ignored the rule of *Dunn*—i.e., that a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.[93] The Ninth Circuit issued a second opinion, again vacating the convictions and carving out an exception to the *Dunn* rule for

---

[90] ECF No. 204 at 66.

[91] ECF No. 213 at 10.

[92] *Id.* (citing *U.S. v. Powell*, 469 U.S. 57, 69 n.8 (1984)).

[93] *Powell*, 469 U.S. at 58, 61; *Dunn v. United States*, 284 U.S. 390 (1932) (abrogated in part).

those situations where a defendant is convicted of facilitation but acquitted of the predicate felony.[94]

The Supreme Court reversed, reaffirming the holding of *Dunn* that inconsistency in a verdict is not grounds for setting it aside.[95] Rather,

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'"[96]

In the footnote upon which Glover-Wing relies, the *Powell* court stated, "Nothing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other. Cf. *United States v. Daigle*, 149 F.Supp. 409 (DC) [1957] . . . ."[97] *Daigle* involved a finding of guilt on separate counts of embezzlement and larceny involving a single transaction, despite instructions to the jury that they could not find the defendant guilty on both counts.[98] As Glover-Wing was not convicted of "logically inconsistent" crimes, the footnote upon which she relies is irrelevant to the issues before this Court. Further, in *U.S. v. Zuniga-Salinas*, the Fifth Circuit, sitting en banc, overruled its line of cases holding that where all but one of the charged conspirators are acquitted, and no "unknown" conspirators are charged, the verdict against one will not stand.[99] Relying on *Dunn* and *Powell*, the Court held, " An inconsistent verdict should no longer be a bar to conviction

---

[94] *Powell* at 61.

[95] *Powell* at 69; *see also Standefer v. United States*, 447 U.S. 10 (1980) (the doctrine of nonmutual collateral estoppel did not bar conviction of aidor and abettor where a prior jury had acquitted the principal).

[96] *Powell* at 63 (quoting *Dunn*, 284 U.S. at 393).

[97] *Powell* at 69 n.8.

[98] *Daigle*, 149 F.Supp. at 414; *see also U.S. v. Moody*, 923 F.2d 341, 346 (5th Cir. 1991) (Permitting a jury to return convictions on mutually exclusive counts "arguably requires that a new trial be granted.").

[99] *U.S. v. Zuniga-Salinas*, 952 F.2d 876, 878 (5th Cir. 1992) (en banc) (overruling *Herman v. United States*, 289 F.2d 362 (5th Cir. 1961) and its progeny).

where all other co-conspirators are acquitted. For the reasons enunciated in *Powell* . . ., such verdicts should not be subject to review for inconsistency."[100] For these reasons (as well as those addressed in section III(B)(1)), the Court finds Defendant has failed to demonstrate that her conviction for conspiracy is infirm due to the acquittal of her co-defendants.

**B.     Motion for New Trial**

**1.     Whether judicial estoppel warrants a new trial.**

Glover-Wing contends a new trial is warranted, because the Court erred in not applying the doctrine of judicial estoppel at trial. Specifically, Defendant asserts that prior to and during trial, the Government "unequivocally limited the scope of the conspiracy to the three charged defendants and explicitly excluded anyone else from the conspiracy."[101] Nevertheless, the Government then, in response to a jury question during deliberations, convinced the Court to instruct the jury in a manner that did not limit the scope of the conspiracy to the three charged defendants, thereby resulting in a violation of her due process rights. Defendant concludes that a new trial is warranted due to this "serious miscarriage of justice."[102] The Government responds that assuming (without conceding) that judicial estoppel can be asserted against the Government in a criminal case, the doctrine is inapplicable to this matter, because the Government "never took an inconsistent position after convincing the Court to accept a prior one."[103]

"Judicial estoppel is an equitable doctrine applied in the court's discretion to 'prevent[] a party from asserting a position in a legal proceeding that is contrary to a position previously taken

---

[100] *Id.* at 879.
[101] ECF No. 214 at 8.
[102] *Id.* at 15.
[103] ECF No. 215 at 5.

by him in the same or some earlier legal proceeding.'"[104] The central purpose of the doctrine is "to protect the integrity of the judicial process and to prevent unfair and manipulative use of the court system by litigants."[105] The Fifth Circuit has identified three requirements that must be found before a party will be judicially estopped: (1) the party sought to be judicially estopped has asserted a legal position which is plainly inconsistent with a prior position, (2) the party convinced the court to accept its prior position, and (3) the party did not act inadvertently.[106] An additional factor identified by the Supreme Court is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."[107]

During deliberations, the jury sent a note asking, "The jury would like to know if 'conspiracy' means between the two doctors and Krystal or if it can also be considered 'conspiracy' if it is Kristal with her staff?"[108] Before responding to the question, counsel for Glover-Wing argued at length that the Government had "represented numerous times that there are no unindicted co-conspirators in this case," and therefore the Court should advise the jury "that the only conspirators alleged in this case are the three listed in the indictment."[109] Counsel pointed to a comment by the Government at a pretrial conference that there were no unindicted co-conspirators, a similar statement made by the Government at sidebar, and a statement made by the Government in closing argument "implying that the conspiracy . . . is between Kristal Glover-Wing and the

---

[104] *United States v. Farrar*, 876 F.3d 702, 709 (5th Cir. 2017) (alteration in original) (quoting *U.S. v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993) ("Generally the doctrine applies to prevent a party from contradicting his own sworn statements.")).
[105] *Farrar* at 709; *see also New Hampshire v. Maine*, 532 U.S. 742, 751 (2001).
[106] *Farrar* at 709; *see also Trinity Marine Products, Inc. v. U.S.*, 812 F.3d 481, 490 (5th Cir. 2016).
[107] *Farrar* at 709 (quoting *Zedner v. United States*, 547 U.S. 489, 504 (2006)).
[108] ECF No. 170 at 1.
[109] ECF No. 205 at 32-33; *see also* ECF No. 190 at 167.

doctors."[110] In light of the forgoing comments, Defendant argued the doctrine of judicial estoppel applied such that the Court should respond to the jury's question by telling it that "the only conspirators alleged in this case are the three listed in the indictment."[111] The Government responded that it had never limited the scope of the conspiracy to the three named defendants, and the statements relied upon by Glover-Wing were made in the context of arguments addressing which subsection of Fed. R. Evid. 801(d)(2) the Government was relying on for the admission of certain testimony—*i.e.*, the party-agent subsection or the party-coconspirator subsection.[112]

After reviewing its notes from a pretrial conference held on February 2, 2023, the Court advised counsel that while its notes did reflect that the Government had made a comment that it was not relying on the coconspirator exception to the hearsay rule because there were no unindicted coconspirators, the comment "was confined to the discussion of whether the co-conspirator hearsay application applied."[113] The Court then noted that the indictment had not limited the scope of the conspiracy to the named defendants, nor had a request been made to limit the jury instructions in such a manner.[114] Rather, counsel for the defendants were requesting that the Court limit the scope of the conspiracy from that alleged in the indictment in response to the jury's question.[115] Ultimately, the Court found the Government had not limited the scope of the conspiracy to the named defendants and responded to the jury's question as follows:

---

[110] ECF No. 205 at 32, 45.

[111] *Id.* at 33, 49.

[112] *Id.* at 33, 37, 40-41, 44-45.

[113] *Id.* at 43; *see also* ECF No. 93 (Government's Feb. 15, 2023 motion to admit evidence under FRE 801(d)(2)(D)). The Court's memory is that this discussion ensued when counsel for Glover-Wing's codefendant inquired as to whether the Court would schedule a pretrial *James* hearing to determine the admissibility of testimony from certain ACH employee witnesses, which counsel deemed to be statements of coconspirators.

[114] ECF No. 205 at 34, 38-39, 43, 50-52; *see also* ECF No. 1 at ¶¶ 19, 21.

[115] *Id.* at 43.

You should review the definition of 'conspiracy' at the bottom of page 7 of the written instructions. Further, the defendants are not on trial for any act, conduct, or offense not alleged in the indictment. In that regard, you should refer to the conspiracy allegations in Count 1 of the Indictment.[116]

Following a thorough review of the transcripts and filings, the Court again finds the doctrine of judicial estoppel is inapplicable to this matter. As stated at trial, the Court finds the Government's statements referencing coconspirators were made in the course of discussions addressing which subsection of the hearsay rule the Government intended to utilize with regard to the testimony of Defendant's former employees. For judicial estoppel to apply, the Government's "later position must be 'clearly inconsistent' with its earlier position."[117] That is not the case here. Further, there was no prior position that the Government convinced the Court to accept. Although Defendant argues the Court only admitted certain testimony because it was convinced by the Government that the scope of the conspiracy was limited to the three named defendants, this argument is incorrect. The Court's evidentiary rulings did not turn on whether or not the named defendants were the sole coconspirators. Rather, those evidentiary rulings turned on whether or not the testimony constituted hearsay, or whether the testimony was excepted by the hearsay rule as "an opposing party's statement."[118] Lastly, the Court is unconvinced that the Government "obtained unfair advantages by asserting and changing its positions."[119] Defendant contends she structured her defense by "relying in good faith on the Government's initial position," and had she not been so induced, she perhaps would not have attempted to place blame on her employees but would have instead attempted to persuade the jury of "an alternative innocent explanation for what

---

[116] *Id.* at 56-57; *see also* ECF No. 170 at 4.
[117] *New Hampshire*, 532 U.S. at 750; *see also Comcast Corp. v. F.C.C.*, 600 F.3d 642, 647 (D.C. Cir. 2010) (as a general rule, doubts about inconsistency "should be resolved by assuming there is no disabling inconsistency," so that the matter is resolved on the merits).
[118] Fed. R. Evid. 801(d)(2).
[119] ECF No. 214 at 12.

is happening in the files."[120] As the Court stated at trial, the problem with this argument is that it was not raised by defendants until the jury sent its question asking about the scope of the conspiracy. No bill of particulars was filed to determine the identity of any coconspirators, and no prior request had been made to instruct the jury that the conspiracy was limited to the charged defendants. Thus, the jury could have reached the conclusion that Glover-Wing conspired with persons other than the charged defendants without sending the note, simply by referring to the indictment and the instructions. For these reasons, the Court finds it unlikely that Defendant's trial strategy was based on its purported understanding that the Government had clearly limited the scope of the conspiracy to the three charged defendants. Further, as discussed in section III(A)(2), *supra*, the jury may have acquitted Glover-Wing's codefendants despite being convinced of their guilt, due to the jury's "assumption of a power which they had no right to exercise, but to which they were disposed through lenity," mistake or compromise.[121] Accordingly, the motion for new trial based on judicial estoppel will be denied.

### 2. Whether an "inconsistent verdict" warrants a new trial.

Finally, Defendant contends she is entitled to a new trial because the "jury verdicts in this case are logically inconsistent."[122] In support, she repeats arguments previously addressed—*i.e.*, had the Court instructed the jury that the Government had limited the scope of the conspiracy to the charged defendants, then "the jury's acquittal of the two doctors would 'logically excludes [sic] a finding of guilt on [Ms. Glover-Wing].'"[123] For the reasons previously set forth, the Court finds the Government never narrowed the participants in this conspiracy to the charged defendants, and the jury's acquittal of Glover-Wing's codefendants has no bearing on her conviction for conspiracy.

---

[120] *Id.* at 13.
[121] *Dunn*, 284 U.S. at 393; *Zuniga-Salinas*, 952 F.2d at 878.
[122] ECF No. 214 at 16.
[123] *Id.* at 16 (alteration in original) (quoting *Powell*, 469 U.S. at 69 n.8).

Accordingly, Defendant's Motion for New Trial will be denied.

## IV.
### CONCLUSION

For the reasons set forth herein, the Motion for Judgment of Acquittal [ECF No. 213] and the Motion for New Trial [ECF No. 214] filed by Kristal Glover-Wing are DENIED.

THUS DONE in Chambers on this 3rd day of April, 2024.


_____
ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE